# Marcum v. Commonwealth.

May 3, 1940.

J. S. Sandusky, Judge.

B. J. Bethurum and Charles J. Walker for appellant.

Hubert Meredith, Attorney General, and William F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

On April 14, 1939, Marcum shot and killed William Ward, at or near James Burdine's store on Highway No. 80, about twenty miles east of Somerset, in Pulaski County. Both men at the time were fruit and vegetable peddlers, carrying on their business by means of trucks.

They were sharp competitors and there had grown up between them some ill-feeling, due to this competition. Marcum at the time of the trial was about 64 years of age, and Ward at the time of his death was just past 32.

There is considerable evidence that the feeling existing was more strongly manifested on the part of Ward towards Marcum. Some witnesses testified that on several occasions Ward was heard to say that he was eventually going to take over Marcum's business. "He was going to play out; his fruit and vegetables were not as good as his;" that he was going to get rid of him as a competitor. It was also proof that Ward had said he was going to kill Marcum "that day."

On the day of the homicide, Ward in his truck and Marcum in his, it was said though sharply disputed, that Ward tried to force Marcum's truck from the highway. Marcum was on his way to call on Burdine at his store, and when he arrived he found Ward at or near the store, and Marcum said to him, "How did you happen to run into me back yonder?" Ward denied that he had done so; Marcum insisted that it was so, repeating, "Yes, you did, you knocked the mirror off my truck." Ward then replied, according to some of the witnesses who were present, "You G. D. old bald-headed s. o. b. I didn't do it." Ward then took off his coat and started toward Marcum. At this point Marcum said: "If you ever do that again I'll shoot you out of your cab." At this Ward grabbed Marcum by the shoulder in a rough manner. Marcum says he was going towards his truck when Ward grabbed him and pushed him, Marcum insisting on having no trouble. Ward, according to some of the evidence, though this is denied, continued to call him vile names.

Marcum insists that he was trying to get to his truck, Ward still pressing him, and finally drew back and hit Marcum with his fist, and on a second attempt Marcum drew his pistol and fired once, the shot taking effect above the heart; Ward died in a very few moments. Marcum says he had his pistol in his right trouser's pocket, and had carried it for some time, because he frequently took with him considerable cash, and had to travel up the "hollers."

There is evidence to the effect that when Marcum

first saw Ward at Burdine's store, he put his right hand on his hip. Appellant says he may have done that, but if so it was a natural and usual movement, since he suffered severe pains in his back, due to rheumatic troubles. This evidence is contradicted, as is also the statement of appellant that he procured his pistol from his right pocket. It was shown that Ward had an ordinary pocket knife in his trousers pocket, which he made no effort to draw.

Marcum, it appears from his testimony, had been a minister of the gospel for about fifteen years, but had taken up peddling business about three years prior to the day of the homicide. He had not known Ward long, though they were competitors traveling the same territory. He tells of Ward cursing him on the day before the homicide, and threatening to knock him off the highway. His evidence as to what occurred at the Burline store is about as detailed above, and in the main is corroborated by Carl Pence, who was driving Marcum's truck at the time.

Seldon Bullock was driving Ward's truck at the time, and while he says he and Ward passed Marcum's truck on the way to Burdine's store, denied that he hit Marcum's truck, or attempted to run him off the road. He says Ward was in Burdine's store trying to sell some apples, when Marcum came up. The first thing Marcum said to Ward was, "If you ever run around me again like that I'll shoot you out of your seat." Marcum had his hand on his hip, and witness says he saw the butt of the weapon. Ward said, "Don't let's have any trouble in this fellow's store." Marcum made some reply not heard by witness. Ward took off his coat, and laid his hand on Marcum's shoulder. Ward was not harming him; "they was backing and walking around. Ward never struck Marcum at any time. Ward took his hand off Marcum's shoulder and Marcum shot him once. At the time the shot was fired the two were five or six feet apart. Ward wasn't doing anything; he had nothing in his hands." He denies that Ward was either drunk or drinking on that day. Other testimony is to the effect that he was drinking, some to the effect that he was drunk.

A number of witnesses testified to threats, and more

than the usual number as to the bad reputation of the deceased and as to the good reputation of appellant. There was also evidence challenging the general reputation for truth and veracity of some of the witnesses; in one instance this is the subject of controversy on appeal.

Upon trial of an indictment which is not challenged, and under instructions which are not subjected to complaint, the jury found appellant guilty of voluntary manslaughter, and fixed his penalty at confinement in the penitentiary for ten years. His motion for a new trial being overruled, judgment was entered, and appellant is now insisting that he is entitled to a reversal. The motion for a new trial was supported by seven or more grounds, however, on appeal, all save those urged in brief, were abandoned. These contentions may be stated substantially as follows:

(a) The commonwealth introduced three witnesses who testified that they were acquainted with the general reputation for truth of defendant's witness Carl Pence, who was the driver of Marcum's truck and an eyewitness. In each instance such witness said that his reputation was bad. Then the commonwealth propounded the following question: "Knowing his reputation in that respect as you do, state to the court and jury whether you could or would give him full faith and credit on oath."

The question was promptly met with objections, which the court overruled, and the witness permitted to answer, and in each instance the witness answered, "No sir." Counsel for appellant insists that by permitting this testimony, the court committed a prejudicial and therefore reversible error, citing Foure v. Commonwealth, 205 Ky. 62, 265 S. W. 443, 446, suggesting that a similar question was therein "condemned in the use of most vigorous language." When we turn to the Foure case, supra, we find that such a question was asked, and we said that "we think the form of the question is subject to criticism," and laid down what we conceived to be a more appropriate form, limiting the question to such "opinion" as the qualifying respondent might hold as to the quality of a statement on oath by the challenged witness.

It is noted that we reversed on what we found to

have been prejudicial errors, in admitting incompetent and rejecting competent evidence, and asking of improper questions. The Foure case was referred to in Shell v. Com., 245 Ky. 223, 53 S. W. (2d) 524, and the conclusion reached in that case as to the proper form of the question, apparently ratified. We may repeat what we said in the Foure case, that the form of the question was improper, but as will be seen we concluded the impropriety of the form did not constitute reversible error.

(b) The chief of police of Somerset was introduced in rebuttal, and after stating that he saw Marcum after the homicide, was asked if he observed a knot or mark on appellant's head. The court would not permit him to answer, on the ground that the matter had been gone into and quite fully exhausted in chief. The witness then avowed that it was true that he saw Marcum the night after the killing and observed a blue place over his eye.

As we examine the record we cannot agree with the court that the material question at issue, i. e., whether Ward struck Marcum before he shot, or struck at all, had been exhausted. Marcum had testified positively that Ward had struck him. One other witness said to the contrary. Other eyewitnesses were uncertain.

After the testimony in chief was in, the commonwealth called three witnesses who testified that they had seen Marcum on the night after the homicide, and at the same place the chief of police had seen him, and were permitted to testify that they observed no bruise or mark, indicating a blow. It will be noted that Marcum's statement as to the bruise was first brought out on his cross-examination, and he perhaps, had the right to believe that the matter would not be the subject of further inquiry.

Under Section 224 of the Criminal Code of Practice it was allowable for the court in his discretion, to permit this evidence to go to the jury. However, we regard this evidence as competent in rebuttal, even though it should have been heard in chief. If for nothing more, it was permissible to contradict the damaging statements of the commonwealth's rebuttal evidence on this point.

We have held that if true conditions may be dis-

closed during a trial by introducing witnesses out of order, it should be allowed. Here, although it may be said that appellant should have anticipated the contradiction and the evidence been heard in chief, the court should have allowed the witness to make answer. See Howard v. Com., 227 Ky. 142, 12 S. W. (2d) 324; Moore v. Com., 143 Ky. 405, 136 S. W. 608; Williams v. Com., 90 Ky. 596, 14 S. W. 595, 12 Ky. Law Rep. 525.

We conclude that the court committed error to the prejudice of the defendant in ruling as he did, but do not anticipate the same situation will exist on a new trial.

(c) Pence, the driver of the Marcum truck, was asked whether or not about a week before the homicide, and at Hines' Garage, he took *that* pistol out of Marcum's truck and showed it to Seldon Bullock and told him that it was what he and Marcum used on competitors. The witness denied making such a statement. All this was over the objection of appellant. Bullock and another witness were then called and testified that Pence had taken one or two pistols out of Marcum's truck, and stated: "This is what we use on people that meddle in our business."

We observe that this colloquy, if it occurred, was at a time and place, when and where it is not shown, that Marcum was present. There is a general rule to the effect that a witness may be impeached by showing that he has made statements differing from his present testimony, for the purpose of testing his veracity, and then bring in contradictory proof.

The general rule also is that the inquiry should relate to a fact that is otherwise relevant and competent, and not collateral. However, since the inquiry here was made upon a collateral matter, and not in the presence of the accused, we cannot say that the testimony was competent. We have frequently held that testimony of third persons as to declarations not made in the presence of the accused is incompetent, particularly when there is no charge of conspiracy or aiding and abetting. A fair example is shown in Searcy v. Com., 188 Ky. 422, 222 S. W. 513; Bennett v. Com., 175 Ky. 540, 194 S. W. 797. In these cases we held conversations between parties not in the presence of accused, to be incompetent, though not prejudicial, due to other facts shown in the

case. See also Combs v. Com., 25 S. W. 590, 15 Ky. Law Rep. 660; Turk v. Com., 239 Ky. 55, 38 S. W. (2d) 937; Shell v. Com., 245 Ky. 535, 53 S. W. (2d) 954; Johnson v. Com., 20 Ky. 297, 62 S. W. (2d) 1025. In the light of these authorities we conclude that the court erred in admitting the evidence.

(d) The matter of alleged misconduct of a juror, or rather the fact, if it were such, that one had manifested prejudice to appellant before his selection, did not as it arose and was disposed of, constitute error. We need not further discuss this matter, since it will probably not occur on another trial. However, for the two errors above noted, we are compelled to reverse the judgment, with directions to the court to grant a new trial.

Judgment reversed.